Good afternoon, Your Honors. Manolo Olasso from the Law Offices of Johnny L. Griffin III. We represent the appellant Christopher Orr. I plan to make a main argument for about 12 minutes and save three minutes for rebuttal. We are here today because of two critical errors committed below. The first critical error happened right at the starting line. It is a false start, if you will, that then throws the rest of the race into serious doubt. The first critical error is either that the court below treated Orr's declaration as a ignored the declaration in favor of the movement's evidence. Whichever error occurred, the result is the same. The school's evidence that it held Orr out as a minister in its literature, including the principal job description and the principal job announcement, and Orr's participation in some Catholic religious activities, led the district court to conclude that Orr is a minister because he purportedly performed vital religious duties for the school. The district court focused on this evidence to the exclusion of relevant evidence submitted by the non-movement. As the declaration shows facts that create a material issue regarding whether or not Orr is a minister, the district court committed reversible error. If teachers in religious schools are ministers, then why isn't the principal a minister? There's a number of reasons why the principal is not, even though a teacher might be. The teacher has, as I believe it's either Morris Iberu or Hosanna Tabor phrased it, has the most direct access to children. That's where the propagation of religious ideas and the transmittal of religious ideas primarily occurs. The plaintiff in Hosanna Tabor, the plaintiffs in Morris Iberu, they had significant contact with students. They had the most opportunity to transmit the tenets of faith, to teach the students the history of their religion, the main beliefs, and how religious practices and worship services relate to those beliefs. A principal, and the record shows this is the case in Orr, Orr never taught a single religion class. He had very limited contact with students. He didn't spend his time in the classroom. The only time students saw him were, or heard from him, was either on the public address system or maybe just passing incidentally in the hallway at certain retreats and at certain worship services on campus. And did he lead prayers? He led, according to his declaration, he led prayers at small meetings but not at large of students. I think the record shows that he led prayers at meetings involving other staff or faculty. He was never on the public address system? I wouldn't say he was never on the public address system. This is a good point. The Christian Brothers says evidence of his reading spiritual thoughts and or prayers over the public address system points to him being a minister. My position is that it does not when you take a deeper dive into his participation in that program. The program is set up by the director of campus ministry, not Orr. Orr doesn't plan the songs or the prayers. He doesn't select them. They're pre-selected. Let me just, you know, it's not a question of was he two minutes on the public address system or lead, you know, what's his overall role? And I think the handbook basically said he shall not fail to ensure that the religious studies curriculum and campus ministry and any changes there to comply with the policy of the education corporation and religious studies, etc, etc. And then they talk about San Francisco and New Orleans. So as the principal and the CEO, wasn't that his responsibility to oversee basically the whole shebang? That was his listed responsibility, your honor. I agree. That's what the literature says. It expects the principal to be doing. And that's an important factor under the law. But I submit that it's not dispositive. I submit that Morris teaches us that what matters most, the weightiest concern is what does he actually do? And in this case, when we're talking about overseeing the curriculum or making sure that Lasallian educational outcomes are being achieved, or that the teachers are being adequately spiritual in their classes, it's not at all clear that he is the leader in those areas. He said in his declaration... In his declaration, he quotes the handbook and says, the superintendent acts as the, or the principal acts as the school's corporate and spiritual leader. That's in his own declaration. Right. That's a description of the president's role. Right. And then he goes on to say in the next, in the next paragraph that he supervised all academic department chairs and goes on, including the director of Christian service. Yes. But again, I believe we have to take a deeper dive and see what he's actually doing with respect to Christian service. There's a campus director of Christian service already in place. Well, you know, what he sort of says is, look, there's kind of a thumb on the scale with Mr. Barnes, et cetera, in terms of what I'm doing, but that doesn't really change what his role is simply because there are other people and other actors that are making input and making decisions about the religious nature of the school. That doesn't change what his role is, does it? I think it does. The other actor evidence, if you will, is helpful. It's relevant in showing who is essential to the accomplishment of the school's mission. Who is the leader regarding certain areas of the school's mission? Who is the person who is distinct from the rest of the school in accomplishing the school's mission? I think that's the, that's the thrust of the other actor evidence, if you will. You know, what the other actor evidence, as I read it, is, okay, so-and-so went out there and he had the lead on curriculum and then so-and-so was out there in terms of information on the campus ministry. And so he lists these people and what they were doing, but that doesn't diminish his overall role. I mean, he never really, you know, speaks to the fact as that he was somehow stripped of any religious role in the school. He only says there's other people doing all these things and therefore I am somehow diminished. That seems to be his argument as I read it. No, the argument is not that he's been stripped of his role, thus he's not a minister. The argument and the record evidence supporting the argument is that if we're to be faithful to Hosanna Tabor and apply the ministerial exception only to those who are special or distinct from the rest of the congregation, somebody who is actually a leader, then we have to look at relevant evidence such as title and training and duties being performed and also the school's representation of what they think the role is. Well, I hear, okay, I hear that argument and let me just, I want you just to assume, not that it's been decided, but I want you to assume that he's determined to be a minister. And if that's the case, I would appreciate it if you could then detail what allegations you think would be left in his harassment claim, assuming that he is a minister. In his harassment claim, Ballard and Elvig teach us that a claim can go forward if, number one, there's no challenge to faith practices and the reasonableness of a religious belief, number one. And then number two, if the remedy sought does not somehow punish the religious organization in its selection or decision to take away duties or otherwise management of an employee, the claim that would go forward, assuming that, or as a minister, a claim could go forward still that he was exposed to a permanently altered workplace or racially offensive, racially hostile work environment in which, number one, language is used, particularly at tuition assistance committee meetings. Certain racist languages is used, invoking racial stereotypes, talking about persons of his race in a contemptuous manner, comments made to him that are coded and racist regarding his inability to keep up or that he uses a colorful language and I'm being generous when I say colorful language, but I'm referring to the GFY language. You want to. These are not typical terms that are associated with racism. You say they're coded terms and so I suppose somebody else besides me would have to draw some conclusions about whether those are coded or not, but the allegations about not bringing more people from the community into the school and being hostile to those people, not moving towards diversity as he thought he was hired to do, since those kind of impact how the school operates, can they be part of a hostile work environment claim? I think they can be in the way that you just framed it. You framed it as you would need more evidence to decide whether this language is racist or part of a code because on its face it seems to be neutral. The evidence regarding how black assistant principals are treated, how outreach to the black community is handled, how tuition assistance to black families is handled would be relevant to then show a jury, look, this language regarding sophistication and ability to keep up, even though it seems on its face race neutral, is actually racist, race-based. I'm just trying to figure out where to draw the line between things that are racial epithets in some way and things that are about how diverse the school is going to be, how much tuition assistance they're going to provide. I think some of the things are getting pretty close to how the religious school operates, so how do you draw the line there? I think we still have, we can take guidance from Ballard and we look at tuition assistance, how those decisions are made, and what language is used in the course of making decisions, and also the treatment of these community outreach programs. It seems to me that where you're getting perilously close to how they decide to run their school, like it or not, so they have a diversity policy which they don't necessarily follow and they're basically kind of abdicating, just in broad terms, they arguably are abdicating on this diversity policy, but isn't that part of how they decide to run the school, as opposed to a racist, a race-based claim against him individually, apart from his ministerial role? We're again asking you to assume he's a minister. Correct. Well, I still think that you can, a court or a fact finder could still look at those circumstances without ever examining what the Catholic faith is behind the school or what their worship practices are. Instead, if we tie them to the language used in these tuition assistance meetings and show the fact finder, look, they have a policy of being anti-racist, and all we're asking you to do is consider how they treated Mr. Orr, what language they subjected him to, the ways in which they talked about people of his race, and see if those circumstances that he testified regarding community outreach, regarding tuition assistance decisions, still support his hostile work environment based on race. Let me give you an example that might be outdated now, but just to help put it in relief. There was a time where the Mormon church had very specific policies against black people, and with respect to rights and the religion and that sort of thing. So let's say he worked at a school run by the Mormons, and that's their policy. I'm not saying it's a policy now because things have changed, but let's say that's their policy. Where do you draw the line then between the religion and what they decide to do, which we're not supposed to look behind, and where the employee comes in who may have a race-based hostile environment claim? How do we draw the line? And that's why I give you this case because it's a very clear historical case of the religion's views. Yes, and I appreciate that, Your Honor. In the example where it's a Mormon employer who just comes out and says, it is our policy to be racist. That would, strangely enough, that would be something that a court could not examine if the harassment claim complains about race-based harassment, because then you're actually delving into their sincerely held belief that racism is part of their faith. In the Orr example, it's completely different. We know that we don't have to examine or question Catholic doctrine regarding racism because it states in their policy that they reject the use of race in employment decisions. I think that's a helpful guide, at least, if not drawing an exact line to at least narrow the boundaries regarding the hostile work environment claim. I see that my time is coming up. We'll give you a couple minutes for a moment. Thank you, Your Honor. We'll hear from the high school. Good afternoon to the court. May it please the court. My name is Paul Gasparri. I represent Christian Brothers High School and Lurken Barnes. Your Honors, I think you need not go farther than appellant's responses to 26 undisputed material facts in the record, before we even get to his self-serving declaration, before we even get to his explanations. He characterizes as undisputed that Christian Brothers is a religious school. Its mission is to inculcate its students in the Catholic faith. Its principal is a leader of the school. The principal's duties are to support the mission of the school. He tries to, in a mere two disputed facts, tries to move away from those. He does not dispute them. He just moves away by them by saying, well, I was a member of the leadership team, but I was a small member. I led prayers only infrequently. I oversaw campus ministry, but that was only a small part of my job. Hosanna Tabor and Morrissey Beru instruct us that that is not the test. We do not apply a stopwatch or get out a ruler and measure the length of time or the amount of paper that one spends on religious activities. Every court that has examined a principal in a Catholic school has found, and I suggest we can find as a matter of law, beyond simply as a matter of fact, that a principal in a Catholic school is a leader of the school and is a minister as taught to us by Hosanna Tabor and Morrissey Beru. So how do you think, just to move on to a different topic, how do you think Bollard fits into this case? Well, Your Honor, I have more than a passing familiarity with Bollard. I argued and Your Honor, I say that not to show my age, but to show Bollard's age. First of all, they're not coextensive in other words. Correct, Your Honor. Bollard preceded Hosanna Tabor. Bollard preceded Morrissey Beru. It was decided at a time when we did not have Supreme Court guidance. So your argument is that those cases are irreconcilable with the Supreme Court. Clearly, Hosanna Tabor referred the miniature exception to all employment, to all allegations concerning employment. Morrissey Beru applied it to all employment decisions. And even Bollard, Bollard found that there was no tangible employment action in Bollard, that it was a pure, I don't mean to minimize it, but a garden variety standalone tort. This sexual harassment, this providing of pornography had nothing to do with job performance, nothing to do with job observation or supervision, and certainly had nothing to do with faith, the Catholic faith, abhorrence. Well, why don't we make this case a little clearer? Suppose instead of the kind of comments that might be interpreted different ways, he was subjected every day to the N-word. Would that kind of hostile environment claim survive? It very well might. And I use the word might if it was used in the context of Bollard, if it was used in the context of a tort unrelated to supervision and evaluation and job performance. In other words, without a tangible employment action. Here, everything that Mr. Orr alleges as animus and as a springboard for the tangible employment action taken against him, which was his termination. In Bollard, there was no tangible employment action. The Jesuits wanted to retain Bollard. Bollard pled a constructive discharge that he was forced to leave. Go back to Mr. Orr's complaint. The word constructive discharge is never found in that argument. That he was subject to harassment, hostile work environment based on race, and he was constructively discharged. Does that fall within the ambit of Bollard? I'm asking you hypothetically. I know you want to answer me with the specifics. I guess my central question is, if you have the same fact pattern generally as Bollard, doesn't, wouldn't race discrimination fall within the ambit of Bollard? Whatever Barton variety race discrimination might be, if you look at it in isolation, might be. Keep in mind that even with respect to Bollard, the Ninth Circuit moved away from it in Elvig. Because in Elvig, the court had a great deal of difficulty trying to parse what was related to the Elvig tangible employment decision and what was, what could be isolated. Here, we can't isolate any of the conduct that Orr complains of because in his complaint, in his actual allegations, Orr says, all of that stuff is evidence of animus as to why I was wrongfully discharged. So in order to get, Orr tees it up for us, and the only way to get to his factual argument is to look behind the decision of the high school to put him on a performance employment plan, and later on, and later on terminated. And those are the tangible employment actions that even Bollard says, the court cannot look by. Bollard says that, you know, quite simply, were there a tangible employment action, we would be forced to simply stop there and not move on. And that's why I draw the distinction between this case in Bollard, between this case and Elvig, and it's coming directly from Orr's own pleadings. So isn't there a difference though, and they might not be the clearest pleadings, but he does have in effect a harassment claim in his complaint, which is that maybe not keeping up with the job is a foundation for supervisory termination. He does appear to make some allegations that don't really relate to his job as much as they relate to a hostile work environment. So would you agree that in principle, a hostile work environment could be separated from the acts protected under ministerial status? Your Honor, in a hypothetical, I would agree with you only to the extent that that hostile work environment was somehow unrelated to the supervision of his work and the employment decisions related to his work, if it was totally divorced. Now, I say that, you know, speaking hypothetically, because in practice, I don't know how that actually will come about. And in this case, looking at Orr's own vermin, we know that it cannot come about because he says everything they did was evidence of why they wrongfully terminated him. And so it all comes back down to the tangible employment decision, looking behind it, was it business-related, was it, you know, or was it pretext? And every court... But he doesn't, that's in the complaint, that's not the case. And so you're here on summary claims, you know, everything has to be looked at in his favor. So if you list all of the claims he makes, and then you throw out the ones that you're talking about, because they led to his supervision or his termination, aren't you left with some kernel of claims that really relate to just a hostile work environment due to his race? I don't think you are. I think if you look at every one of his vermin, at the end of the day, we're not left with anything. Once you throw out everything related to his supervision or the relationship between he and his president, he and the trustees, and he and his co-workers, it all goes to his performance as principal. In this case, the district judge never got to the issue as to whether there was a hostile work environment claim, correct? Because the judge thought that the ministerial exception covered and wiped it out. So there's no parsing of the summary judgment allegations as to whether they can be separated from the employment actions. The district judge didn't do that, right? Well, the district judge said it all was inextricably intertwined to a tangible employment decision. That is exactly what I am arguing here. Yeah, I thought the district judge basically had decided that Bollard did not survive the Supreme Court cases. Well, I don't know that he flat out said that. I think he did take, you know, he did, it was certainly argued strenuously in the papers as to whether Bollard was you know, applicable, whether Bollard was distinguishable. We laid out the analysis as to why Bollard was totally distinguishable, particularly because in Bollard there was no tangible employment action. And here, the entire case is based upon a tangible employment action. Well, it does require some parsing because if you have a straight hostile work environment claim based on race, that's different from a tangible employment action or it can be. And if you parse it out, and that's the kernel that's left, I think you'd have to say that creating a hostile work environment based on race has nothing to do with religion in this context, wouldn't you? Well, in that context, yes. I mean, with race. Clearly, you know, the Catholic faith abhors, you know, racial discrimination. But as we placed in our papers, you're now, you know, this court can't weaponize, you know, the faith to punish it for, you know, as, you know, your honor said, if your faith, you know, that's not the intent of the. No, no. I was asking a slightly different question in the sense of that we know that the Catholic religion doesn't endorse a hostile work environment based on race. And therefore, if there is a hostile work environment based on race, it doesn't have a religious purpose. You'd agree with that? Yes. On that statement, I certainly would agree too. But again, look, but from what this court has got to do, it has to look at that tangible employment action, and it cannot look behind it. The ministerial exception is not limited to you can, you're free to make real employment decisions based upon religion, but not on anything else. You can't look behind the employment decision of a minister, no matter what it's based on. And I think that's the distinction from what your honor is suggesting. You're right. But there's a difference between a hostile work environment claim and a, and I say a termination and employment claim. They're different. They can be mixed and your argument is here. In this case, they are, but they also can be distinct theories. They clearly could be distinct theories based upon distinct facts. Here, they're inextricably intertwined, and that you cannot pull them apart. But in theory, in theory, yes, you could. In theory, like Bollard, you can have a situation where the employee feels the situation is so intolerable, he has to leave, where the employer does not want the employee to leave. Those are the facts of Bollard. We have the exact opposite here. So your time is about to expire. Do you want to summarize? Or I think you've summarized well, but that's. I asked this court to affirm. All right. Thank you. Put on two minutes for rebuttal. Thank you very much, your honor. Judge Thomas had asked the question, is there a way to reconcile Bollard with Hosanna Tabor and Morrissey Beru? And I believe there is. Hosanna Tabor and Morrissey Beru expressly state that they're just determining, or they're just deciding a case that questions a termination. They're not deciding any other case, specifically they're not deciding a case that may involve tortious conduct. And here, a hostile work environment claim is akin to tortious conduct. It's not a tangible employment action, the kind that Hosanna Tabor and Morrissey Beru say cannot be examined. Instead, as in Bollard, you can examine them. Judge Restani gave a very good example of the kind of hostile work claim that can still be examined. That is where a racist slur is used repeatedly in the workplace. The cases emphasize that if the so-called criteria in question is not a legitimate part of the employment process or a legitimate part of the employment decision-making process, then it can be examined. It's not a protected basis decision that somehow involves the exception. The ministerial exception doesn't apply based on the nature of the claim, i.e. hostile work environment, and also the nature of the remedy sought. Here, and I just want to be very clear on my position, Bollard lives even after Hosanna Tabor, even after Morrissey Beru, and I think I have three appellate judges in Chicago who agree with me. Unfortunately, they're not controlling, but the rationale is good. I submit that Orr's hostile work environment claim should go forward. The case should be remanded on all the claims, but especially on the Bollard-style hostile work environment claim. On that, I submit it. Thank you. Thank you both for your arguments today. The case just argued will be submitted for decision, and we'll be in recess for the afternoon. All rise.
judges: THOMAS, McKEOWN, Restani